**ANSA ASSUNCAO, LLP**
(A Pennsylvania Limited Liability Partnership)
Two Tower Center Boulevard, Suite 1600
East Brunswick, New Jersey 08816
Ph: (732) 993-9850
Fax: (732) 993-9851
Attorneys for Defendant, Jackson Hewitt Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JACKSON HEWITT INC. <br><br> *Plaintiff,* <br><br> v. <br><br> BARNES ENTERPRISES, INC., a South Carolina Corporation; and Richard S. Barnes, an individual; <br><br><br> *Defendants.* | Case No. <br><br><br> **VERIFIED COMPLAINT** |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiff Jackson Hewitt Inc. ("Jackson Hewitt"), by its attorneys, and for its Verified Complaint ("Complaint") for Injunctive Relief and Damages for trademark infringement, unfair competition, and breach of contract against defendants Barnes Enterprises, Inc. ("Barnes Enterprises") and Richard S. Barnes ("Barnes") (collectively, "Defendants"), state as follows:

### <u>Parties</u>

1.      Plaintiff Jackson Hewitt is a Virginia corporation with its principal place of business in Parsippany, New Jersey. Jackson Hewitt is engaged in the business of granting franchises to qualified individuals and entities to operate income tax preparation businesses under the Jackson Hewitt name.

2.      Defendant Barnes Enterprises is a South Carolina corporation with its principal

place of business in South Carolina.  Barnes Enterprises is a former Jackson Hewitt franchisee.

3.      Defendant Barnes is a citizen and resident of the State of South Carolina.  Barnes owns 100% of Barnes Enterprises and is the guarantor of Barnes Enterprises' obligations under each of the franchise agreements between Barnes Enterprises and Jackson Hewitt.

**Jurisdiction and Venue**

4.      This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and under the common-law.

5.      This Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331, 1338 and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.  This Court also has original subject matter jurisdiction of this action under 28 U.S.C. § 1332, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      This Court has personal jurisdiction over Barnes Enterprises by virtue of, among other things, section 28.2 of each of the eight separate franchise agreements by and between Jackson Hewitt and Barnes Enterprises, described in more detail below, pursuant to which Barnes Enterprises has consented to personal jurisdiction in "the United States District Court nearest to [Jackson Hewitt's] principal place of business, (presently the District of New Jersey, Newark Division)."

7.      This Court has personal jurisdiction over Barnes by virtue of, among other things, the terms of the eight guaranties, described in more detail below, pursuant to which Barnes

personally guaranteed Barnes Enterprises' obligations and covenants under the franchise agreements entered into between Jackson Hewitt and Barnes Enterprises.

8.      Venue is proper in this District pursuant to section 28.3 of the Franchise Agreements, inasmuch as that provision contains an express waiver by Barnes Enterprises of any objection to venue in this District.

<u>**Summary of the Action**</u>

9.      Jackson Hewitt entered into eight substantially identical franchise agreements with Barnes Enterprises for the operation of certain Jackson Hewitt income tax preparation businesses.  Additionally, Barnes personally guaranteed Barnes Enterprises obligations under the franchise agreements.

10.      During the course of this contractual relationship, Barnes Enterprises failed to remit specific payments, required pursuant to the terms of the franchise agreements, to Jackson Hewitt, and, as a result, Jackson Hewitt terminated the franchise agreements between itself and Barnes Enterprises.

11.      Upon termination of the franchise agreements, Defendants were required to comply with certain post-termination obligations including, but not limited to, paying Jackson Hewitt all monies due and owing under the franchise agreements, returning Jackson Hewitt's confidential information, and refraining from operating competing income tax return preparation businesses within a specific, defined area.

12.      As of the date of termination, Defendants owed Jackson Hewitt $1,034,714.44 in past due royalty, advertising fees, rents, outstanding billed promissory notes, remaining unbilled promissory notes, and interest, with interest accruing daily until the balance is paid in full.

13.      Despite the termination of the franchise agreements, upon information and belief,

Defendants are operating competing tax businesses in Barnes Enterprises' former franchise locations, under Jackson Hewitt's trademarks.

14.     Jackson Hewitt seeks, among other things, a preliminary and permanent injunction (i) enjoining Defendants' wrongful and unlawful use of Jackson Hewitt's federally registered trademarks, and (ii) enforcing the post-termination obligations set forth in the Franchise Agreements entered into by and between Barnes Enterprises and Jackson Hewitt. Jackson Hewitt also seeks damages for Defendants' infringing and other wrongful conduct, as well as the attorneys' fees and costs it has incurred and will incur in prosecuting this action, as provided by statute and the parties' written Franchise Agreements.

**The Jackson Hewitt System and Marks**

15.     Since 1986, Jackson Hewitt has engaged in the business of operating, and franchising others to operate, individual income tax return preparation businesses throughout the United States.   Jackson Hewitt provides computerized preparation of federal, state and local individual income tax returns through a nationwide network of franchised and company-owned offices.

16.     The core of Jackson Hewitt's business is its franchise system.   Through its franchisees, Jackson Hewitt develops and maintains relationships with its customers.   Repeat business from customers that return to Jackson Hewitt year after year is important to Jackson Hewitt's success.

17.     Based upon years of experience, Jackson Hewitt has developed and operates, and is the sole and exclusive owner of, a stringent individual income tax preparation business system (the "Jackson Hewitt System").   The Jackson Hewitt System is a comprehensive system for the development and operation of Jackson Hewitt franchise locations that is designed to ensure that

Jackson Hewitt franchises and the services and products offered by the franchises meet uniform, high quality standards. The Jackson Hewitt System is also designed to protect Jackson Hewitt's name and reputation. As such, all Jackson Hewitt franchise contracts require franchisees to comply with the Jackson Hewitt System in the operation of their Jackson Hewitt tax preparation businesses.

18.     As part of the Jackson Hewitt System, franchisees may offer income tax preparation courses to members of the public through Jackson Hewitt Tax School. Franchisees operating Jackson Hewitt Tax School offer basic courses designed to teach individuals the skills necessary to prepare individual income tax returns, as well as more intermediate and advanced courses. These courses are an important tool for recruitment and retention of tax preparers and other tax professionals, who are critical to the successful operation of a Jackson Hewitt Tax Service business.

19.     The pre-tax season begins in November and is critical to Jackson Hewitt's business because it is the time when Jackson Hewitt and its franchisees market, train individuals, and introduce and roll out new products and services for the upcoming tax season, shore up relationships with existing customers, and work hard to develop new customer relationships. It is essential that Jackson Hewitt's offices prepare during the autumn months in order to be properly positioned for a successful tax season and to receive customers during the winter months.

20.     During the tax season, Jackson Hewitt receives the bulk of its business in January and February, the first two months of tax season, and tax season ends on April 15 (or the next business day if the 15th is not a business day) of any given year. A substantial portion of Jackson Hewitt's revenue is derived during the first two months of the tax season.

21.     Jackson Hewitt has the exclusive right to sublicense the use of certain trade names

and service marks, logos, and derivations thereof (the "Jackson Hewitt Marks"), for individual tax preparation services to the public under the Jackson Hewitt name.  The Jackson Hewitt Marks include, but are not limited to the following:

| MARK | REG. NO. | ISSUED |
|------|----------|--------|
| Jackson Hewitt Tax Service | 1,501,580 | 08/23/88 |
| Jackson Hewitt | 2,138,700 | 02/24/98 |

22.     The Jackson Hewitt Marks serve to identify the source, origin and sponsorship of Jackson Hewitt income tax preparation businesses and the products and services they offer, and to distinguish those tax preparation businesses, products and services from those established, made, and offered by others.

23.     The Jackson Hewitt Marks are registered on the Principal Register of the United States Patent and Trademark Office.  The registrations of the Jackson Hewitt Marks, and all other registrations for trademarks or service marks which are part of the Jackson Hewitt System, have always been and continue in full force and effect, and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065. Each registration set forth above is *prima facie* evidence of the validity of the registration of the Jackson Hewitt Marks, of Jackson Hewitt's ownership of those marks, and of Jackson Hewitt's exclusive right to use those marks in commerce on the service and goods listed above, as provided in 15 U.S.C. § 1057(b) and § 1115(a).

24.     Jackson Hewitt has given notice to the public of the registration of the Jackson Hewitt Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that Jackson Hewitt remains the exclusive user of the Jackson Hewitt Marks.

25.     Jackson Hewitt uses or has used the words "Jackson Hewitt Tax Service" and "Jackson Hewitt," among others, as abbreviations of its brand names.

26.     Jackson Hewitt has continuously used the Jackson Hewitt Marks in interstate commerce in connection with the promotion, operation and franchising of Jackson Hewitt income tax preparation businesses and the promotion and sale of the products and services they offer throughout the United States, including the State of South Carolina, since the dates of their registration.

27.     Jackson Hewitt has the exclusive right to use and license the Jackson Hewitt Marks and derivations thereof. Pursuant to written franchise agreements entered into by and between Jackson Hewitt and its authorized and approved franchisees, Jackson Hewitt grants franchises to qualified persons to own and operate a Jackson Hewitt income tax return preparation business using the Jackson Hewitt Marks, but only in such a manner and at such locations as are expressly authorized by Jackson Hewitt.

28.     Jackson Hewitt has invested substantial effort over a long period of time, including the expenditure of millions of dollars, advertising and promoting Jackson Hewitt income tax return preparation businesses and the products and services that they offer under the Jackson Hewitt Marks throughout the United States. As a result of such effort, the products and services offered by Jackson Hewitt income tax return preparation businesses under the Jackson Hewitt Marks have met with widespread public approval and established demand and goodwill among consumers throughout the United States and cause consumers throughout the United States to recognize the Jackson Hewitt Marks as distinctly designating Jackson Hewitt tax return preparation services as originating with Jackson Hewitt.

29.     The value of the goodwill developed in the Jackson Hewitt Marks does not admit of precise monetary calculation, but because Jackson Hewitt is one of only a few national tax

preparation franchise systems in the United States and is widely known as a provider of such services, the value of Jackson Hewitt's goodwill exceeds millions of dollars.

30.     The Jackson Hewitt Marks are famous in the tax return preparation industry.

## The Franchise Agreements Between the Parties

### SC010 Franchise Agreement

31.     On or about May 8, 2003, Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29067; 29101; 29550; 29584; 28709; 29718; 29727; and 29741 ("SC010 Franchise Agreement").

32.     On or about May 8, 2003, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC010 Franchise Agreement.

33.     The SC010 Franchise Agreement had an initial term of ten (10) years.  On or about October 13, 2009, Jackson Hewitt and Barnes Enterprises entered into an addendum to the SC010 Franchise agreement renewing the agreement for an additional ten (10) years.

34.     On or about October 13, 2009, Barnes entered into another guaranty with Jackson Hewitt personally guaranteeing Barnes Enterprises' performance and obligations under the renewed SC010 Franchise Agreement ("SC010 Guaranty").

35.     Pursuant to the terms of the SC010 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

36.     Pursuant to the terms of the SC010 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

37.     Pursuant to the terms of the SC010 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC010 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC010 Franchise Agreement.

### SC018 Franchise Agreement

38.     On or about May 8, 2003, Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29536; 29543; 29547; 29563; 29565; 29567; 29571; 29574; 29581; and 29592. ("SC018 Franchise Agreement").

39.     On or about May 8, 2003, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC018 Franchise Agreement.

40.     The SC018 Franchise Agreement had an initial term of ten (10) years.  On or about October 13, 2009, Jackson Hewitt and Barnes Enterprises entered into an addendum to the SC018 Franchise agreement renewing the agreement for an additional ten (10) years.

41.     On or about October 13, 2009, Barnes entered into another guaranty with Jackson Hewitt personally guarantying Barnes Enterprises' performance and obligations under the

renewed SC018 Franchise Agreement ("SC018 Guaranty").

42.     Pursuant to the terms of the SC018 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

43.     Pursuant to the terms of the SC018 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

44.     Pursuant to the terms of the SC018 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC018 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC018 Franchise Agreement.

### SC243 Franchise Agreement

45.     On or about May 8, 2003, Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29009;  29010;  29046;  29069;  29080;  29104;  29532;  and 29540 ("SC243 Franchise Agreement").

46.     On or about May 8, 2003, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC243

Franchise Agreement.

47.     The SC243 Franchise Agreement had an initial term of ten (10) years.  On or about October 13, 2009, Jackson Hewitt and Barnes Enterprises entered into an addendum to the SC243 Franchise agreement renewing the agreement for an additional ten (10) years.

48.     On or about October 13, 2009, Barnes entered into another guaranty with Jackson Hewitt personally guarantying Barnes Enterprises' performance and obligations under the renewed SC243 Franchise Agreement ("SC243 Guaranty").

49.     Pursuant to the terms of the SC243 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

50.     Pursuant to the terms of the SC243 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

**51.**     Pursuant to the terms of the SC243 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC243 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC243 Franchise Agreement.

### SC011 Franchise Agreement

52.     On or about September 13, 2004 Jackson Hewitt entered into a franchise

agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29512; 29516; 29520; 29525; 29570; 29593; and 29596. ("SC011 Franchise Agreement").

53.     On or about September 13, 2004, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC011 Franchise Agreement.

54.     The SC011 Franchise Agreement had an initial term of ten (10) years.  On or about October 13, 2009, Jackson Hewitt and Barnes Enterprises entered into an addendum to the SC011 Franchise agreement renewing the agreement for an additional ten (10) years.

55.     On or about October 13, 2009, Barnes entered into another guaranty with Jackson Hewitt personally guarantying Barnes Enterprises' performance and obligations under the renewed SC011 Franchise Agreement ("SC011 Guaranty").

56.     Pursuant to the terms of the SC011 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

57.     Pursuant to the terms of the SC011 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

58.     Pursuant to the terms of the SC011 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC011 Franchise

Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC011 Franchise Agreement.

### SC008 Franchise Agreement

59.     On or about March 29, 2006 Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 27404; 29712; 29714; 29720; and 29728. ("SC008 Franchise Agreement").

60.     On or about March 29, 2006, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC008 Franchise Agreement ("SC008 Guaranty").

61.     Pursuant to the terms of the SC008 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

62.     Pursuant to the terms of the SC008 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

63.     Pursuant to the terms of the SC008 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations. In addition, Barnes agreed to comply with all of the covenants contained in the SC008 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring

employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC008 Franchise Agreement.

### SC009 Franchise Agreement

64.     On or about June 19, 2008 Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29020; 29032; 29045; 29058; 29078; 29130; and 29175. ("SC009 Franchise Agreement").

65.     On or about June 19, 2008, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC009 Franchise Agreement ("SC009 Guaranty").

66.     Pursuant to the terms of the SC009 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

67.     Pursuant to the terms of the SC009 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

68.     Pursuant to the terms of the SC009 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations. In addition, Barnes agreed to comply with all of the covenants contained in the SC009 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any

other covenants which by their terms require performance after the termination of the SC009 Franchise Agreement.

**SC200 Franchise Agreement**

69.     On or about June 19, 2008 Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by the following zip codes: 29206; 29207; 29223; and 29229. ("SC200 Franchise Agreement").

70.     On or about June 19, 2008, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC200 Franchise Agreement ("SC200 Guaranty").

71.     Pursuant to the terms of the SC200 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

72.     Pursuant to the terms of the SC200 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

73.     Pursuant to the terms of the SC200 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations. In addition, Barnes agreed to comply with all of the covenants contained in the SC200 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC200

Franchise Agreement.

## SC014 Franchise Agreement

74.     On or about May 16, 2001, Jackson Hewitt entered into a franchise agreement with Barnes for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina in the following zip codes: 29501;  29502;  and 29506. ("SC014 2001 Franchise Agreement").

75.     On or about May 16, 2001, Barnes entered into a guaranty with Jackson Hewitt personally guarantying Barnes' performance and obligations under the SC014 Franchise Agreement ("SC014 2001 Guaranty"). .

76.     On or about August 29, 2001, Jackson Hewitt and Barnes entered into an addendum transferring the SC014 Franchise Agreement from Barnes to Barnes Enterprises.

77.     The SC014 Franchise Agreement had an initial term of ten (10) years.  On or about November 10, 2008, Jackson Hewitt and Barnes Enterprises entered into a new franchise agreement, renewing the agreement for an additional ten (10) years.

78.     On or about November 10, 2008, Barnes entered into another guaranty with Jackson Hewitt personally guarantying Barnes Enterprises' performance and obligations under the New SC011 Franchise Agreement ("SC011 Guaranty").

79.     Pursuant to the terms of the SC014 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

80.     Pursuant to the terms of the SC014 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises']

liabilities."

81.     Pursuant to the terms of the SC014 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC014 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC014 Franchise Agreement.

<strong>SC201 Franchise Agreement</strong>

82.     On or about January 15, 2009 Jackson Hewitt entered into a franchise agreement with Barnes Enterprises for the license and operation of income tax return preparation businesses within a defined geographic area in South Carolina designated by areas in the following zip codes: 29016; 29130; 29203; and 29229. ("SC201 Franchise Agreement").

83.     On or about January 15, 2009, Barnes entered into a guaranty with Jackson Hewitt, personally guarantying Barnes Enterprises' performance and obligations under the SC201 Franchise Agreement ("SC201 Guaranty").

84.     Pursuant to the terms of the SC201 Guaranty, Barnes guaranteed that Barnes Enterprises would "timely and fully perform each and every provision, covenant, payment, agreement and undertaking found in the Franchise Agreement,...any Note...and any other Collateral Agreement with Jackson Hewitt."

85.     Pursuant to the terms of the SC201 Guaranty, Barnes agreed, among other things, that Jackson Hewitt may "resort to [Barnes] for payment of any [of Barnes Enterprises'] liabilities."

86.     Pursuant to the terms of the SC201 Guaranty, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.  In addition, Barnes agreed to comply with all of the covenants contained in the SC201 Franchise Agreement, including the covenant not to compete, covenant against recruiting or hiring employees, covenant not to solicit, covenant to protect trade secrets, indemnification, and any other covenants which by their terms require performance after the termination of the SC201 Franchise Agreement.

### Promissory Notes Between the Parties

87.     A Promissory Note for the territories under the SC008 Franchise Agreement, SC009 Franchise Agreement, SC010 Franchise Agreement, SC011 Franchise Agreement, SC014 Franchise Agreement, SC018 Franchise Agreement, SC200 Franchise Agreement, SC201 Franchise Agreement, and SC243 Franchise Agreement (collectively, the "Franchise Agreements"), dated November 1, 2009, was made by Barnes Enterprises and Barnes in favor of Jackson Hewitt ("Promissory Note").

88.     Storefront Development Promissory Notes for territories under the SC009 Franchise Agreement and SC018 Franchise Agreement, dated November 10, 2008, were made by Barnes Enterprises and Barnes in favor of Jackson Hewitt ("Storefront Development Notes," and together with the Promissory Note, the "Notes").

### Defendants' Defaults and the Termination of the Franchise Agreements

89.     Pursuant to the terms of the Franchise Agreements, Barnes Enterprises was obligated to pay Jackson Hewitt royalty fees, advertising fees, electronic filing fees, and other fees (collectively, "Fees"), which were determined as a percentage of the "Gross Volume of Business" conducted at its franchised locations.

90.    Pursuant to the terms of the Franchise Agreements, the "Gross Volume of Business" is defined as "the total revenue and other consideration from the Franchised Business."

91.    Pursuant to section 5 of the Franchise Agreements, Barnes Enterprises was obligated to pay Jackson Hewitt royalty fees on a semi-monthly basis from January 1 through April 15 and on a monthly basis from May 1 through December 31.

92.    Pursuant to section 6.1 of the Franchise Agreements, Barnes Enterprises was obligated to pay Jackson Hewitt advertising and marketing fees on a semi-monthly basis from January 1 through April 15 and on a monthly basis from May 1 through December 31.

93.    Pursuant to sections 8.7 and 15.1 of the Franchise Agreements, Barnes Enterprises was required to submit all reports, including Gross Volume of Business Reports, to Jackson Hewitt within the time specified by Jackson Hewitt, and was required to pay a late fee of $50.00 per office for each Gross Volume of Business Report submitted after its due date.

94.    Pursuant to section 8.4 of the Franchise Agreements, Barnes Enterprises agreed to pay interest to Jackson Hewitt at the rate of eighteen percent (18%) per year, or at the highest legal rate of interest permitted by law, whichever was less, on any amounts owed to Jackson Hewitt that were more than five (5) days overdue.

95.    Pursuant to the section 20.2 of the Franchise Agreements, Jackson Hewitt could terminate the Franchise Agreements for good cause for various reasons, including, Barnes Enterprises' failure to pay any sums due under the Franchise Agreements or any collateral agreements within five days after delivery of a notice to cure.

96.    By letter dated July 14, 2010, Jackson Hewitt sent Barnes Enterprises a Notice to Cure ("Notice to Cure") and informed Barnes Enterprises that it was in default of the Franchise

Agreements by reason of its failure to pay its financial obligations in accordance with the terms of the Franchise Agreements and the Promissory Notes. The Notice to Cure further advised Barnes Enterprises that, unless the defaults were cured within five days after delivery of the Notice to Cure, Jackson Hewitt would terminate the Franchise Agreements and Barnes Enterprises' rights thereunder.

97.     Barnes Enterprises failed to cure the defaults referenced in the Notice to Cure.

98.     By letter dated August 10, 2010, Jackson Hewitt terminated the Franchise Agreements effective August 9, 2010 ("Termination Notice").

99.     The Termination Notice demanded, among other things, that Barnes Enterprises: (1) pay Jackson Hewitt all past due royalty and advertising fees, rents, outstanding billed promissory notes, and remaining unbilled promissory notes; (2) remove all Jackson Hewitt signage from each franchised location under the Franchise Agreements; and (3) comply with all post-termination obligations under the Franchise Agreements.

100.    As of August 9, 2010, Barnes Enterprises owed Jackson Hewitt $1,034,714.44 in past due royalty, advertising fees, rents, outstanding billed promissory notes, remaining unbilled promissory notes, and interest, with interest accruing daily until the balance is paid in full.

101.    The Termination Notice also advised Barnes Enterprises of its post-termination obligations as set forth in the Franchise Agreements, enclosed a list of Barnes Enterprises' "Post Termination Obligations," and advised Barnes Enterprises that Jackson Hewitt would conduct an inspection of Barnes Enterprises' territories to determine compliance with those obligations.

### Defendants' Post-Termination Obligations

102.    Upon termination of the Franchise Agreements, Defendants were obligated to comply with a number of post-termination obligations. Section 20.3(a)-(j) of the Franchise

Agreements details Barnes Enterprises' obligations in the event of termination of the Franchise Agreements, including its obligation to:

(a) immediately pay all amounts due and owing under the Franchise Agreements and all Collateral Agreements;

(b) return to Jackson Hewitt all originals and copies of all trade secret and confidential Jackson Hewitt information and client files, without retaining copies, and all collateral agreements;

(c) delete all confidential materials and client files from its computers and hard drives;

(d) comply with the post-term covenant not to compete contained in section 18 of the Franchise Agreements;

(e) notify the telephone company and all listing agencies and advertising directories for the Territories that Barnes Enterprises no longer has the right to use such telephone numbers and listings, and authorizing the transfer of same to Jackson Hewitt;

(f) return to Jackson Hewitt all leased equipment from any leasing program Jackson Hewitt arranges or sponsors;

(g) return to Jackson Hewitt or destroy all literature, sign facings and unused advertising materials bearing the Jackson Hewitt Marks; and

(h) immediately cease identifying itself as a present or former Jackson Hewitt franchisee or franchise owner.

103.    Pursuant to section 18.2 of the Franchise Agreements, Barnes Enterprises agreed that, for a period of two years after the effective date of termination, it would not "directly or indirectly prepare or electronically file individual income tax returns, teach tax courses, offer

Financial Products or own, engage in, operate, manage, purchase, invest in . . . franchise, lend money to, lease or sublease to . . . any Competing Tax Business . . . within the Territor[ies] or within an area ten (10) miles outside the boundaries of the Territor[ies]."

104.    "Competing Tax Business" is defined in the Franchise Agreements to mean "any business that offers tax return preparation, electronic filing, Financial Products or other services that are the same or similar to those offered by Jackson Hewitt Tax Service businesses."

105.    "Financial Products" is defined in the Franchise Agreements to mean "Refund Anticipation Loans, Accelerated Check Refunds, Assisted Direct Deposits and any other similar or substitute products [Jackson Hewitt] offer[s]."

106.    The purpose of the covenant contained in section 18.2 of the Franchise Agreements is to, among other things, provide Jackson Hewitt the opportunity to transfer customers to new or existing Jackson Hewitt franchisees.

107.    Pursuant to section 12.4 of the Franchise Agreements, Barnes Enterprises expressly acknowledged that Jackson Hewitt or its designee "are free to contact and serve the customers from [Barnes Enterprises'] former Franchise Business[es] to offer to sell them tax return preparation, electronic filing and any other services," in the event of termination.

108.    Pursuant to section 18.7 of the Franchise Agreements, Barnes Enterprises expressly acknowledged that the restrictions contained in the Franchise Agreements' covenants "are reasonable and necessary to protect [Jackson Hewitt] and [Jackson Hewitt's] franchised system, and that they [would] not impose any undue hardship on [Barnes Enterprises] since [Barnes Enterprises has] other skills, experience or education that will afford [it] the opportunity to derive income from other endeavors."

## Defendants' Breach of Their Post-Termination Obligations

### Defendants' Breach of the Covenants Not to Compete and Not to Solicit

109.    Despite Barnes Enterprises' contractual obligations pursuant to section 18 of the Franchise Agreements, upon information and belief, Barnes Enterprises is engaged in a Competing Tax Business within its former territories under the Franchise Agreements.

110.    Upon information and belief, Barnes Enterprises is operating Competing Tax Businesses, in breach of its obligations contained in the Franchise Agreements, at the following three former Jackson Hewitt franchise locations:   203 East Main Street, Dillon South Carolina 29536 (within the boundaries of the SC018 Franchise Agreement); 1906 East Highway 76, Marion South Carolina 29571 (within the boundaries of the SC018 Franchise Agreement); and 10060 Two Notch Road, Columbia South Carolina 29223 (within the boundaries of the SC200 Franchise Agreement).

111.    Despite Barnes Enterprises' contractual obligations pursuant to section 18 of the Franchise Agreements, Barnes Enterprises is teaching tax courses within its former territories under the Franchise Agreements.

112.    Despite his obligations under the SC010 Guaranty, SC018 Guaranty, SC243 Guaranty, SC011 Guaranty, SC008 Guaranty, SC009 Guaranty, SC200 Guaranty, SC014 Guaranty, and the SC201 Guaranty (collectively, the "Guaranties"), Barnes has failed to personally comply with Jackson Hewitt's post-termination obligations, including, without limitation, the covenants not to compete.

113.    Defendants' failure to comply with their covenants not to compete hinders Jackson Hewitt's ability to provide tax preparation services to existing clients and threatens to destroy Jackson Hewitt's relations with its customers in Barnes Enterprises' former territories

under the Franchise Agreements.

**Defendants' Failure to Return Jackson Hewitt's Confidential and Proprietary Materials**

114.    Pursuant to section 12.3.2 of the Franchise Agreements, Barnes Enterprises agreed that the unauthorized use or disclosure of Jackson Hewitt's trade secrets, confidential and proprietary information "will cause irreparable injury and that damages are not an adequate remedy."

115.    Pursuant to section 12.3.1 of the Franchise Agreements, Barnes Enterprises expressly acknowledged that the following information constitutes Jackson Hewitt's "trade secrets, confidential and proprietary information":

> the identities of customers served by the Franchised Business (including their names, addresses, phone numbers, social security numbers and financial and tax information), tax return copies (whether on disk, in a database, in any other computer data storage media, or on paper), customer lists, mailing labels, W-2s, 1099s, 8453s, work in progress, all "books " and "archive" program disks, bookkeeping files, Financial Products applications and other Financial Products related documents, [and] any other documents related to services performed on behalf of customers . . . .

116.    Pursuant to section 18.5 of the Franchise Agreements, Barnes Enterprises agreed that it would not disclose any trade secrets of Jackson Hewitt, as defined in section 12.3 of the Franchise Agreements.

117.    Notwithstanding Barnes Enterprises' contractual obligations pursuant to the Franchise Agreements, Barnes Enterprises has failed to turn over all confidential and proprietary information supplied by Jackson Hewitt, and all confidential and proprietary client information.

118.    Notwithstanding Barnes' obligations under the Guaranties, Barnes has failed to turn over all confidential and proprietary information supplied by Jackson Hewitt, and all confidential and proprietary client information.

**Defendants' Continued Use of The Jackson Hewitt Marks**

119.   Despite Barnes Enterprises' contractual obligations under the Franchise Agreements and Barnes' obligations under the Guaranties, upon information and belief, Defendants have continued to use the Jackson Hewitt Marks to induce the consuming public to use Defendants' income tax return preparation services.

120.   Upon information and belief, since August 9, 2010, Defendants have used the Jackson Hewitt Marks without authorization by, among other things, failing to remove Jackson Hewitt signage from the Territories.   Photographs taken on August 24, 2010 of Barnes Enterprises former franchise locations at 203 East Main Street, Dillon South Carolina 29536 (within the boundaries of the SC018 Franchise Agreement); 1906 East Highway 76, Marion South Carolina 29571 (within the boundaries of the SC018 Franchise Agreement); and 2415 Second Loop Road, Suite A, Florence South Carolina 29501 (within the boundaries of the SC014 Franchise Agreement) confirm that Defendants continue to prominently display the Jackson Hewitt Marks on exterior signage.

121.   Defendants have used the Jackson Hewitt Marks on advertising circulars to advertise the offer of income tax preparation courses to members of the public through Jackson Hewitt Tax School, with courses to begin in September 2010, after the termination of the Franchise Agreements.

122.   Defendants have used materials and books containing the Jackson Hewitt Marks to teach income tax preparation courses to members of the public.

123.   Defendants have used the Jackson Hewitt Marks on advertising circulars to identify and advertise check cashing and bill payment businesses operating out of Barnes Enterprises' former franchise locations ("Check Cashing Circular").

**Defendants' Failure to Pay the Monies Owed to Jackson Hewitt**

124.    Despite Barnes Enterprises' contractual obligations under the Franchise Agreements, Barnes Enterprises has failed to pay all monies owed to Jackson Hewitt pursuant to the Franchise Agreements.

125.    Despite his obligations under the Guaranties, Barnes has failed to pay the monies owed to Jackson Hewitt pursuant to the Franchise Agreements.

126.    Despite Defendants' contractual obligations under the Notes, Defendants have failed to pay all monies owed to Jackson Hewitt pursuant to the Notes.

**Jackson Hewitt's Additional Rights Under the Franchise Agreements**

127.    Pursuant to section 28.18 of the Franchise Agreements, Barnes Enterprises expressly agreed that "the non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred by the prevailing party to enforce [these] Agreement[s] or any Collateral Agreement[s]."

128.    Pursuant to section 16.3 of the Franchise Agreements, Jackson Hewitt has the right to conduct a post-termination audit, and Barnes Enterprises has the obligation to cooperate in any post-termination audit, of records that Jackson Hewitt was required to maintain under the terms of the Franchise Agreements.

129.    Pursuant to section 18.6 of the Franchise Agreements, Barnes Enterprises expressly acknowledged Jackson Hewitt's right to obtain temporary and permanent injunctive relief in the event of Barnes Enterprises' violation of any of the covenants contained in section 18, as well as all monies Barnes Enterprises realized from its violation of any of the covenants contained in section 18.

130.    Pursuant to section 28.6 of the Franchise Agreements, Barnes Enterprises further agreed that Jackson Hewitt would be entitled to punitive and exemplary damages and injunctive

relief in the event of Barnes Enterprises' infringement of the Jackson Hewitt Marks.

131.   Pursuant to section 28.14 of the Franchise Agreements, Barnes Enterprises expressly acknowledged Jackson Hewitt's right to obtain temporary and permanent injunctive relief as follows:

> [Jackson Hewitt] or [its] designee may obtain without bond, temporary and permanent injunctions and orders of specific performance to enforce [Jackson Hewitt's] exclusive rights in [the Jackson Hewitt Marks], to enforce [Barnes Enterprises'] post-termination . . . obligations . . . to prevent the unauthorized use or disclosure of [Jackson Hewitt's] trade secret, proprietary or confidential information, and to prohibit any act or omission by [Barnes Enterprises] that is . . . misleading to any current or prospective customers. . . .

## COUNT I
### Federal Trademark Infringement
### (Section 32 of the Lanham Act)

132.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

133.   Section 32 of the Lanham Act, 15 U.S.C. §1114(1)(a), provides in relevant part that "[a]ny person who shall, without the consent of the registrant – use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause by mistake, or to deceive...shall be liable in a civil action by the registrant...."

134.   Defendants' acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Jackson Hewitt Marks, and Defendants' sale, offering for sale, distribution or advertising of goods and services under the Jackson Hewitt Marks, or any designs similar thereto, is likely to cause confusion or

mistake or to deceive the public in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(l).

135.    As a direct and proximate result of Defendants' infringement, Jackson Hewitt has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

136.    Pursuant to section 28.6 of the Franchise Agreements, Barnes Enterprises agreed that Jackson Hewitt would be entitled to punitive and exemplary damages for its violation of Jackson Hewitt's exclusive rights in the Jackson Hewitt Marks.

137.    Pursuant to section 28.14 of the Franchise Agreements, Barnes Enterprises expressly agreed that Jackson Hewitt may obtain, without bond, temporary and permanent injunctive relief and orders of specific performance to enforce Jackson Hewitt's exclusive rights in the Jackson Hewitt Marks.

138.    Jackson Hewitt has no adequate remedy at law because the Jackson Hewitt Marks are unique and represent to the public Jackson Hewitt's identity, reputation, and goodwill, such that damages alone cannot fully compensate Jackson Hewitt for Defendants' misconduct.

139.    Unless enjoined by the Court, Defendants will continue to use and infringe the Jackson Hewitt Marks, to Jackson Hewitt's irreparable injury.  This threat of future injury to Jackson Hewitt's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Jackson Hewitt Marks and to ameliorate and mitigate Jackson Hewitt's injuries.

**COUNT II**
**Federal Unfair Competition**
**(Section 43(a) of the Lanham Act)**

140.    Jackson Hewitt realleges and incorporates herein by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

141.   Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), provides in relevant part that "[a]ny person who, on or in connection with any goods or services...uses in commerce any word, term, name, symbol...or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation...or as to the origin, sponsorship, or approval of...goods [or] services...shall be liable in a civil action...."

142.   Defendants' acts of sale, offering for sale, distribution or advertising of goods and services under the Jackson Hewitt Marks, or any designs similar thereto constitutes unfair competition, false designation of origin, and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C § 1125(a).

143.   As a direct and proximate result of Defendants' unfair competition, Jackson Hewitt has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

144.   Pursuant to section 28.6 of the Franchise Agreements, Barnes Enterprises agreed that Jackson Hewitt would be entitled to punitive and exemplary damages for its violation of Jackson Hewitt's exclusive rights in the Jackson Hewitt Marks.

145.   Pursuant to section 28.14 of the Franchise Agreements, Barnes Enterprises expressly agreed that Jackson Hewitt may obtain, without bond, temporary and permanent injunctive relief and orders of specific performance to enforce Jackson Hewitt's exclusive rights

in the Jackson Hewitt Marks.

146.    Jackson Hewitt has no adequate remedy at law because the Jackson Hewitt Marks are unique and represent to the public Jackson Hewitt's identity, reputation, and goodwill, such that damages alone cannot fully compensate Jackson Hewitt for Defendants' misconduct.

147.    Unless enjoined by the Court, Defendants will continue to use and infringe the Jackson Hewitt Marks, to Jackson Hewitt's irreparable injury.   This threat of future injury to Jackson Hewitt's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Jackson Hewitt Marks and to ameliorate and mitigate Jackson Hewitt's injuries.

## COUNT III
### Federal Trademark Dilution
### (Section 42(c) of the Lanham Act)

148.    Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c), provides in relevant part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use beings after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this section."

150.    The Jackson Hewitt Marks have become "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

151.    The use of the Jackson Hewitt Marks by Defendants in connection with tax preparation services, after the Jackson Hewitt Marks became famous, have caused and will

continue to cause dilution and disparagement of the distinctive quality of the Jackson Hewitt marks, and have lessened and will continue to lessen the capacity of the Jackson Hewitt Marks to identify and distinguish the goods and services of Jackson Hewitt, all in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

152.   Defendants willfully intended to trade on the reputation of Jackson Hewitt or to cause dilution of the Jackson Hewitt Marks.

153.   As a direct and proximate result of Defendants' ongoing violation of Section 43(c) of the Lanham Act, Jackson Hewitt has been seriously damaged and, unless Defendants are restrained from future violations of Jackson Hewitt's rights with respect to the Jackson Hewitt Marks, will continue to be so damaged.

154.   Pursuant to section 28.6 of the Franchise Agreements, Barnes Enterprises agreed that Jackson Hewitt would be entitled to punitive and exemplary damages for its violation of Jackson Hewitt's exclusive rights in the Jackson Hewitt Marks.

155.   Pursuant to section 28.14 of the Franchise Agreements, Barnes Enterprises expressly agreed that Jackson Hewitt may obtain, without bond, temporary and permanent injunctive relief and orders of specific performance to enforce Jackson Hewitt's exclusive rights in the Jackson Hewitt Marks.

156.   Jackson Hewitt has no adequate remedy at law because the Jackson Hewitt Marks are unique and represent to the public Jackson Hewitt's identity, reputation, and goodwill, such that damages alone cannot fully compensate Jackson Hewitt for Barnes Enterprises' misconduct.

157.   Unless enjoined by the Court, Defendants will continue dilute the Jackson Hewitt Marks, to Jackson Hewitt's irreparable injury.  This threat of future injury to Jackson Hewitt's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants'

continued use of the Jackson Hewitt Marks and to ameliorate and mitigate Jackson Hewitt's injuries.

**COUNT IV**
**Common Law Trademark Infringement**

158.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159.   Jackson Hewitt has common law rights to the Jackson Hewitt Marks.

160.   Defendants' sale, offering for sale, distribution or advertising of goods and services under the Jackson Hewitt Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public as to the nature, source and sponsorship of Defendants' services, all in violation of the common law of the State of South Carolina.

161.   Defendants' infringement is willful, has damaged Jackson Hewitt, and entitled Jackson Hewitt to punitive damages.

162.   The foregoing acts of Defendants have caused Jackson Hewitt irreparable harm, and unless enjoined, the acts of Defendants alleged herein will continue to do so.  Jackson Hewitt has no adequate remedy at law.

**COUNT V**
**Common Law Unfair Competition**

163.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

164.   Defendants' acts of sale, offering for sale, distribution or advertising of goods and services under the Jackson Hewitt Marks, or any designs similar thereto constitutes unfair competition in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature,

characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of the common law of the State of South Carolina.

165.    As a direct and proximate result of Defendants' unfair competition, Jackson Hewitt has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

166.    Defendants' acts of unfair competition were and continue to be willful and have damaged Jackson Hewitt, and entitle Jackson Hewitt to damages, including punitive damages.

167.    The foregoing acts of Defendants have caused Jackson Hewitt irreparable harm, and unless enjoined, the acts of Defendants alleged herein will continue to do so.  Jackson Hewitt has no adequate remedy at law.

**COUNT VI**
**Unfair and Deceptive Trade Practices Act**
**(South Carolina Code §39-5-140)**

168.    Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

169.    Defendants' use in trade and commerce of the Jackson Hewitt Marks to identify and designate Defendants' income tax preparation businesses is an unfair and deceptive trade practice pursuant to S.C. Code Ann. §39-5-140.

170.    Defendants' acts of sale, offering for sale, distribution or advertising of goods and services under the Jackson Hewitt Marks, or any designs similar thereto is likely to cause confusion among the public or to cause mistake, to deceive the public as to the affiliation, connection, or association of the parties, and/or to misrepresent to the public the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities.

171.     Without a deterrence or a change in Defendants' use of the Jackson Hewitt Marks, this consumer confusion will continue.

172.     As a proximate cause of Defendants' unfair and deceptive use of the Jackson Hewitt Marks, Jackson Hewitt has suffered damages, including, but not limited to, loss of profits.

**COUNT VII**
**Breach of Contract – Post-Termination Obligations**

173.     Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174.     Pursuant to the Franchise Agreements, Barnes Enterprises was required to return all confidential, proprietary and trade secret information and client files to Jackson Hewitt upon the termination of the Franchise Agreements.

175.     Pursuant to the Franchise Agreements, Barnes Enterprises was required to transfer all telephone numbers used or advertised in the former franchise Territories to Jackson Hewitt or its designees upon termination of the Franchise Agreements, with all charges paid in full up to the date of transfer.

176.     Pursuant to the terms of the Guaranties, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations.

177.     Notwithstanding the foregoing obligations, Defendants have wrongfully retained and misappropriated Jackson Hewitt's confidential and proprietary information; have wrongfully retained and misappropriated confidential and proprietary client information from the income tax return preparation businesses; and have wrongfully failed to transfer all telephone numbers and accounts used in the former Territories to Jackson Hewitt as required.

178.     Pursuant to sections 12.3.1 and 12.3.2 of the Franchise Agreements, Barnes Enterprises expressly acknowledged that the customer files and information wrongfully retained

by Barnes Enterprises are Jackson Hewitt's "trade secrets, confidential and proprietary information," and that unauthorized use or disclosure of such information "will cause irreparable injury" to Jackson Hewitt, such that "damages are not an adequate remedy."

179.   As a direct and proximate result of Defendants' wrongful failure to comply with their contractual and post-termination obligations, Jackson Hewitt has been and continues to be injured in its business and property, and has and will continue to suffer irreparable injury.

## COUNT VIII
### Breach of Contract – Unpaid Fees

180.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.   Pursuant to sections 5, 6, and 8 of the Franchise Agreements, Barnes Enterprises was obligated to remit royalty fees, advertising and marketing fees, electronic filing fees and other fees to Jackson Hewitt.

182.   Despite its obligation to do so, Barnes Enterprises failed to remit certain of the Fees due and owing under the Franchise Agreements.

183.   Barnes Enterprises' failure to remit the agreed monies has damaged Jackson Hewitt in the amount of at least $454,072.41.

## COUNT IX
### Breach of Contract – Breach of the Notes

184.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

185.   Pursuant to the terms of the Notes, Defendants were obligated to pay the principal sums as set forth therein, as well as any interest accrued thereon.

186.   Despite their obligation to do so, Defendants have not paid Jackson Hewitt the

full amounts due and owing under the Notes.

187.    Under the terms of the Notes, Defendants are liable for all attorneys' fees and costs incurred by Jackson Hewitt to enforce Defendants' obligations under the Notes.

188.    The failure of Defendants to pay Jackson Hewitt all amounts due and owing under the Notes constitutes a breach of the Notes and has damaged Jackson Hewitt in the amount of at least $580,642.03.

## COUNT X
### Breach of Contract – Covenant Not To Compete

189.    Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

190.    Pursuant to section 18.2 of the Franchise Agreements, Barnes Enterprises agreed, among other things, not to directly or indirectly prepare or electronically file individual income tax returns, teach tax courses, offer Financial Products, or own, engage in, operate, or manage a Competing Tax Business for a period of two years, within Barnes Enterprises' former Territories, and within an area ten miles outside the boundaries of the Territories, from the date of termination of the Franchise Agreements.

191.    Pursuant to section 18.7 of the Franchise Agreements, Barnes Enterprises acknowledged that the restrictions contained in the covenants were reasonable and necessary to protect Jackson Hewitt and that they would not impose any undue hardship on Barnes Enterprises.

192.    Pursuant to section 18.6 of the Franchise Agreements, Barnes Enterprises expressly acknowledged Jackson Hewitt's right to obtain temporary and permanent injunctive relief in the event of Barnes Enterprises' violation of any of the covenants contained in section 18.

193.    Pursuant to section 18.6 of the Franchise Agreements, Barnes Enterprises agreed that Jackson Hewitt is entitled to all monies and other consideration Barnes Enterprises receives, as well as all other damages, as a result of a violation of any of the covenants contained in section 18.

194.    Pursuant to the terms of the Guaranties, Barnes agreed, among other things, that he would personally comply with all of Barnes Enterprises' post-termination obligations, including the covenant not to compete.

195.    Effective August 9, 2010, Jackson Hewitt terminated the Franchise Agreements. As a result, pursuant to the non-compete provisions of the Franchise Agreements, Barnes Enterprises and Barnes are prohibited from, among other things, directly or indirectly preparing or electronically filing income tax returns, teaching tax courses, offering Financial Products, or participating in a Competing Tax Business within the former Territories, and within an area ten miles outside the boundaries of the Territories, for a period of two years from the date of this Court's order.

196.    Notwithstanding the foregoing contractual obligations, Defendants are in breach of their obligations contained in the Franchise Agreements as a result of their participation in Competing Tax Businesses at the following three former Jackson Hewitt franchise locations: 203 East Main Street, Dillon South Carolina 29536 (within the boundaries of the SC018 Franchise Agreement); 1906 East Highway 76, Marion South Carolina 29571 (within the boundaries of the SC018 Franchise Agreement); and 10060 Two Notch Road, Columbia South Carolina 29223 (within the boundaries of the SC200 Franchise Agreement).

197.    Notwithstanding the foregoing contractual obligations, Defendants are in breach of their obligations contained in the Franchise Agreements as a result of their teaching income

tax preparation courses to members of the public.

198.    As a direct and proximate result of Defendants' breaches, Jackson Hewitt has suffered and will continue to suffer irreparable harm.

## COUNT XI
### Unjust Enrichment

199.    Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

200.    At the time of the termination of the Franchise Agreements, Barnes Enterprises was obligated to pay certain Fees to Jackson Hewitt.

201.    Despite Barnes Enterprises' obligation to do so, Barnes Enterprises failed to remit certain of the Fees due and owing under the Franchise Agreements.

202.    Pursuant to the terms of the Notes, Defendants were obligated to remit principal sums and interest due and owing to Jackson Hewitt.

203.    Despite Defendants' obligations to do so, Defendants failed to remit certain principal sums and interest due and owing under the Notes.

204.    Defendants' failure to compensate Jackson Hewitt constitutes unjust enrichment and has damaged Jackson Hewitt.

## COUNT XII
### Breach of the Guaranties

205.    Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.    Pursuant to the terms of the Guaranties, Barnes agreed, among other things, that upon a default under the Franchise Agreements, he would immediately make each payments and perform each obligation required of Barnes Enterprises under the Franchise Agreements and any

other Collateral Agreements between

207.   Despite Barnes' obligations to do so, he has failed to make any payments or perform of cause Barnes Enterprises to perform each obligation required pursuant to the Franchise Agreements and any other Collateral Agreements with Jackson Hewitt.

208.   Pursuant to the Guaranties, Barnes is liable to Jackson Hewitt for all of the outstanding amounts due and owing to Jackson Hewitt under the Franchise Agreements and all other Collateral Agreements, including the Notes.

## COUNT IX
**Accounting**

209.   Jackson Hewitt realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

210.   Barnes Enterprises has engaged in acts and practices, as described, which amount to infringement of the Jackson Hewitt Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

211.   Barnes Enterprises failed to fully report Barnes Enterprises' Gross Volume of Business prior to the termination of the Franchise Agreements, and after the termination of the Franchise Agreements, during the time when Barnes Enterprises has wrongfully continued to use the Jackson Hewitt Marks within the Territories.

212.   Defendants have further engaged in acts and practices, as described, which amount to a violation of their post-termination covenants not to compete as provided by section 18 of the Franchise Agreements.

213.   As a result, Defendants owe restitution and the disgorgement of profits, in an amount unknown to Jackson Hewitt, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial

materials, statements, and books from Defendants.

214.    Pursuant to sections 16.2 and 16.3 of the Franchise Agreements, Barnes Enterprises agreed to pay Jackson Hewitt the costs associated with Jackson Hewitt's audits of its Territories that were necessitated by Barnes Enterprises' failure to comply with the Franchise Agreements.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Jackson Hewitt respectfully prays for the following relief against Defendants:

1.    On the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief:

 a.    Enter a preliminary and permanent injunction enjoining Defendants, and their agents, servants, employees, representatives, attorneys and/or affiliates, and all those who act in concert or participation with them from:

  i.    Using the Jackson Hewitt Marks or any trademark, service mark, logo or trade name that is confusingly similar to the Jackson Hewitt Marks;

  ii.    Otherwise infringing the Jackson Hewitt Marks or using any similar designation, alone or in combination with any other components;

  iii.    Passing off any of their products or services as those of Jackson Hewitt or its authorized franchisees;

  iv.    Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of their businesses, products or services;

  v.    Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with Jackson Hewitt and its franchisees or any of Jackson Hewitt's products or services; and

  vi.    Unfairly competing with Jackson Hewitt or its franchisees in any manner;

 b.    An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of Defendants, and their affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation with

them, bearing the Jackson Hewitt Marks, and all plates, molds, and other means of making the same, if any, be delivered to Jackson Hewitt at Defendants' cost;

c.      That Defendants be required to immediately eliminate their advertising under the Jackson Hewitt Marks or any other confusingly similar designations from all media, including, but not limited to, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, all at Defendants' cost;

d.      That Defendants be required to file with the Court and to serve upon Jackson Hewitt's counsel, within ten (10) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order;

e.      That Defendants account to Jackson Hewitt and pay over to Jackson Hewitt all gains, profits and advantages derived by them as a result of their infringement of the Jackson Hewitt Marks, breach of contract and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

f.      An Order directing Defendants immediately to perform their contractual post-termination obligations under the Franchise Agreements, including, without limitation, their obligations:

   i.       To take any and all necessary steps to cancel and/or transfer to Jackson Hewitt any telephone numbers associated with Jackson Hewitt or the Jackson Hewitt Marks used in connection with the operation of Defendants' former franchise locations; and

   ii.      To return to Jackson Hewitt all Operating Manuals and other materials provided to Defendants in connection with the operation of their former franchise locations;

g.      Grant compensatory damages and, as appropriate, treble damages in an amount to be determined at trial.

2.      On the Eighth and Ninth Claims of Relief:

a.      Award damages to Jackson Hewitt against Defendants in an amount to be determined at trial, which should include all monies due and owing under the Franchise Agreements and the Notes.

3.      On the Tenth Claim of Relief:

      a.     Enter a preliminary and permanent injunction enjoining Defendants, and their employees, agents, servants, and representatives from preparing or electronically filing individual income tax returns, offering Financial Products, or participating in any way in a Competing Tax Business within each territory under the Franchise Agreements, and within ten miles of the boundaries of each territory under the Franchise Agreements, until two years from the date of this Court's order.

4.      On the Eleventh Claim of Relief:

      a.     Award of damages to Jackson Hewitt against Barnes Enterprises for the monies due and owing under the Franchise Agreements and against Defendants for monies due and owing under the Notes.

5.      On the Twelfth Claim of Relief:

      a.     Award of damages to Jackson Hewitt against Barnes for damages in the amount of all outstanding monies due and owing under the Franchise Agreements and all other Collateral Agreements.

6.      On the Thirteenth Claim of Relief:

      a.     An order that an independent accounting be conducted, at Defendants' expense, of Defendants' books, records, and accounts to determine the proper amount of royalties due and owing to Jackson Hewitt both prior to termination and following termination of the Franchise Agreements, and as a result of Defendants' participation in a Competing Tax Business in, and within ten miles of the boundaries of the territories under the Franchise Agreements, and awarding compensatory damages to Jackson Hewitt in connection therewith.

7.      On the Fourth and Fifth Claims of Relief:

      a.     Award of punitive damages to Jackson Hewitt against Defendants.

8.      On All Claims for Relief:

      a.     An award of the costs and expenses, including reasonable attorneys' fees, incurred by Jackson Hewitt in connection with this action as provided for by statute, the Franchise Agreements, and the Notes;

      b.     Prejudgment and postjudgment interest; and

      c.     Such other and further relief as the Court deems just and proper.

Dated: October 4, 2010

*/s/ James S. Coons*

James S. Coons
ANSA ASSUNCAO, LLP
Two Tower Center Boulevard, Suite 1600
East Brunswick, New Jersey 08816
Telephone:  732-993-9850
Facsimile:   732-993-9851
James.Coons@ansalaw.com
Attorneys for Plaintiff, Jackson Hewitt Inc.

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify, under penalty of perjury, that to the best of my knowledge, this matter is not the

subject of any other action pending in any court or of any pending arbitration or administrative

proceeding.


Dated: October 4, 2010

*/s/ James S. Coons*
_____
James S. Coons
ANSA ASSUNCAO, LLP
Two Tower Center Boulevard, Suite 1600
East Brunswick, New Jersey 08816
Telephone:  732-993-9850
Facsimile:  732-993-9851
James.Coons@ansalaw.com
Attorneys for Plaintiff, Jackson Hewitt Inc.

## VERIFICATION

STATE OF NEW JERSEY  )
                             ) ss:
COUNTY OF MORRIS  )

       Arnold Janofsky, of full age, being duly sworn according to law, upon his oath, deposes and says:

       1.     I am Vice President of Franchise Sales Administration and Compliance of Jackson Hewitt Inc. ("Jackson Hewitt"), the plaintiff in this action.

       2.     I have read the foregoing Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Complaint are true based on my personal knowledge, my review of the records of Jackson Hewitt, or information available to me through employees of Jackson Hewitt.

                                            _____
                                             Arnold Janofsky

Sworn and subscribed to
Before me this 4 day
of October 2010.

_____
Notary Public

MARGARET A SCOTT
Notary Public
State of New Jersey
My Commission Expires Nov 9, 2014

MARGARET A SCOTT
Notary Public
State of New Jersey
Commission Expires Nov 9 2014

